IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KEVIN B. SAPP and JAIME HOPPER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 19-912-RGA |
| | ) | |
| INDUSTRIAL ACTION SERVICES, LLC and RELADYNE, LLC, | ) ) | |
| | ) | |
| Defendants. | ) | |

## **REPORT AND RECOMMENDATION**

Pending before the Court is a motion (the "Motion") filed pursuant to Federal Rule of Civil Procedure 12(b)(6) by Defendants Industrial Action Services, LLC ("IAS") and RelaDyne, LLC ("RelaDyne," and collectively with IAS, "Defendants"), seeking dismissal of Plaintiffs Kevin B. Sapp ("Mr. Sapp") and Jaime Hopper's (collectively, "Plaintiffs") operative Second Amended Complaint ("SAC"). (D.I. 35) For the reasons that follow, the Court recommends that the Motion be DENIED.

## I. BACKGROUND

### A. Factual Background

Plaintiffs were officers and executives of two companies, Industrial Action Services, Inc. and IAS Canada, Inc. (the "Companies"), which were in the business of providing oil flushing and chemical cleaning services. (D.I. 34 at ¶¶ 6-7) In 2015, RelaDyne expressed interest in buying the Companies, and created a new subsidiary, IAS, with the intention that IAS would be the entity that actually purchased the Companies. (*Id.* at ¶¶ 10-11) On January 29, 2016, Plaintiffs and the Companies entered into an Asset Purchase Agreement ("APA") with IAS, in which, *inter alia*, IAS did in fact purchase the Companies. (*Id.* at ¶ 11 & ex. A ("APA"))

Disputes later arose between the parties related to the APA and the manner in which IAS and RelaDyne operated, which gave rise to the instant litigation.

In the APA, IAS (or "Buyer") purchased substantially all assets of the Companies. In return, IAS not only agreed to pay Plaintiffs and the Companies (the "Sellers") certain cash compensation, but it also agreed to pay Sellers certain "Earn Out Consideration" "if any" during three twelve-month periods following the closing date (the "Earn Out Periods"). (APA at § 2.6) Section 2.6(b) of the APA sets out the method by which Earn Out Consideration would be determined during this timeframe; it provides that the payment for each Earn Out Period would be "in an amount equal to Fifty Percent (50%) of the amount, if any, by which actual Buyer EBITDA for [that period] exceeds the Buyer EBITDA Target for [that period]" up to certain maximum amounts, which could not exceed $5 million in total. (*Id.* at § 2.6(b))[1] Section 2.6(c) also set out a process by which, no later than 90 days following the end of each Earn Out Period, IAS would deliver to Mr. Sapp an "Earn Out Statement" that set forth IAS's "computation" of Buyer EBITDA for the Earn Out Period and the Earn Out Consideration due for that period. (*Id.* at § 2.6(c)) Section 2.6(d) provides that for 30 days following delivery of that Earn Out Statement, Mr. Sapp and his advisors could review "all relevant documents relating to the preparation of such Earn Out Statement" and that the Earn Out Statement would become "final

---

[1] "Buyer EBITDA" was defined in the APA to mean, for each Earn Out Period: "the sum of the following amounts for Buyer [i.e., IAS] and Turbo Filtration, LLC ["TFC"] , . . . on a combined basis, as determined by Buyer in good faith in accordance with GAAP, consistently applied: (a) net income, *plus* (b) interest expense, *plus* (c) taxes on income, *plus* (d) depreciation expense, *plus* (e) any corporate overhead allocated to Buyer or [TFC] by Buyer's Affiliates, *plus* (j) [sic] any expenses related to or arising from the transactions contemplated by this Agreement, including all Post-Closing Retention Payments, *minus* (k) [sic] any gain on the sale of assets or other non-operating income." (APA at Index of Defined Terms at 45 (emphasis in original))

and binding" on the 30th day, unless Mr. Sapp "gives written notice of disagreement with such Earn Out Statement to Buyer" prior to that date, "whereupon such disagreement will be settled according to the procedures set forth in Section 2.3(e)" of the APA. (*Id.* at § 2.6(d)) Section 2.6(f) states, *inter alia*, that during the Earn Out Period, in the event of the "Buyer's sale or disposition of substantially all of the Acquired Assets" then the Sellers were to receive the $5 million maximum Earn Out amount (less the aggregate amount of any Earn Out Consideration already paid). (*Id.* at § 2.6(f)) And Section 2.6(g) of the APA (the "good faith provision") also states that "Buyer assumes an obligation of good faith and fair dealing with respect to the operation of the Business during the Earn Out Period, agrees to use reasonable efforts to maintain the Business substantially intact and agrees to refrain from taking any action designed to circumvent payment of Earn Out Consideration under this Section 2.6." (*Id.* at § 2.6(g))

As was noted above, Section 2.6(d) of the APA allowed that if Mr. Sapp gave a "written notice of disagreement" with an Earn Out statement, then that disagreement would be settled pursuant to the procedures set out in the APA's Section 2.3(e). Section 2.3(e), in turn, states that if a "Notice of Disagreement is received by Buyer in a timely manner," then the parties had 60 days to try to resolve their dispute. (*Id.* at § 2.3(e)) It then explains that "[a]t the end of that 60-day period, Buyer and the Sellers shall submit to an independent accounting firm (the 'Accounting Firm') for resolution of any and all matters that remain in dispute and were properly included in the Notice of Disagreement." (*Id.* (emphasis omitted)) And it notes that "Buyer and the Sellers agree to use commercially reasonable good faith efforts to cause the Accounting Firm to render a decision resolving the matters submitted to the Accounting Firm within 30 days." (*Id.*)

B.     **Procedural Background**

Plaintiffs filed their original Complaint in this matter in Texas state court on February 11, 2019; the case was removed to the United States District Court for the Southern District of Texas ("Southern District of Texas") on the basis of diversity jurisdiction on March 12, 2019. (D.I. 1 & ex. B) The Southern District of Texas Court thereafter transferred the case to this Court on venue grounds on May 16, 2019. (D.I. 17)

Plaintiffs filed the SAC on July 1, 2019, (D.I. 34), and Defendant filed the instant Motion on August 1, 2019, (D.I. 35). The Motion was fully briefed as of September 6, 2019, (D.I. 40), and was referred to the Court for resolution by United States District Judge Richard G. Andrews on October 9, 2019, (D.I. 44). At Plaintiffs' request, (D.I. 41), the Court held oral argument on the Motion on March 19, 2020.

The Court will set out any additional facts relevant to resolution of the Motion in Section II.

## II. DISCUSSION

Defendants make a number of arguments in support of their Motion. Their primary argument is that this case should be stayed, pursuant to the requirements of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 3,[2] because in the APA, the parties agreed to arbitrate the disputes that are set out in the SAC. (D.I. 36 at 10-14; D.I. 40 at 5-8) The Court will address that issue first, and then will address Defendants' other arguments for dismissal.

### A. Motion to Compel a Stay In Favor of Arbitration

---

[2] In their briefing, Defendants had sought dismissal of the claims (not a stay) on this basis. (*See* D.I. 36 at 10-14, 20) During oral argument, however, Defendants' counsel acknowledged that if the matters in dispute were arbitrable pursuant to the FAA, a stay of the case, not dismissal of the claims, is the appropriate remedy. 9 U.S.C. § 3; *Lloyd v. HOVENSA, LLC*, 369 F.3d 263, 268-69 (3d Cir. 2004); *Katz v. Rittenhouse Org., Inc.*, C.A. No. 19-546 (MN), 2020 WL 374712, at *2 (D. Del. Jan. 23, 2020).

In the SAC, Plaintiffs allege that, *inter alia*, Defendants failed to comply with Section 2.6(g)'s good faith provision. More specifically, Plaintiffs contend that after the APA was executed, Defendants took various steps to ensure that IAS either did not obtain certain jobs that it should have or that it obtained lower revenues on jobs than it should have—and thus, that IAS did not earn revenues that otherwise should have been factored into calculation of "Buyer EBITDA" in the relevant time periods. (D.I. 34 at ¶¶ 19-39) It is alleged that Defendants made this happen by instructing other RelaDyne subsidiaries or third parties to bid on those jobs, or by otherwise diverting resources away from IAS. (*Id.*) Defendants, for their part, claim that pursuant to the APA, allegations such as these were supposed to be submitted to arbitration overseen by the Accounting Firm, and that it is thus up to the Accounting Firm, not this Court, to resolve such disputes. (D.I. 36 at 13 ("Accordingly, the accounting/firm arbitrator here can decide whether, as Plaintiffs claim, IAS failed to calculate the Earn Out Consideration correctly by not including other revenue that they believe should have been counted because Defendants did not operate the business in good faith or systematically devalued the business for the purpose of having to pay Earn Out Consideration."))

In *Andre v. Dollar Tree Stores, Inc*., Civil Action No. 18-142-VAC-CJB, 2018 WL 3323825, at *3-5 (D. Del. July 6, 2018), the Court set out the legal standards that apply to review of a party's motion to compel a stay in favor of arbitration, made pursuant to the FAA. The Court incorporates by reference its description of that legal standard into the instant Report and Recommendation. As explained in *Andre*, in deciding whether to compel arbitration under the FAA, a court first considers whether there is a valid agreement to arbitrate between the parties ("step one"); if there is, the Court then considers whether the merits-based dispute in question falls within the scope of that valid agreement ("step two"). *See Flintkote Co. v. Aviva PLC*, 769

F.3d 215, 220 (3d Cir. 2014); *John Hancock Mut. Life Ins. Co. v. Olick*, 151 F.3d 132, 137 (3d Cir. 1998).

In the Court's view, one of the arguments that Plaintiffs make in opposition to this portion of the Motion implicates a step one question—that is, Plaintiffs *do* contest "whether there is a valid agreement to arbitrate between the parties[.]" *Flintkote Co.* 769 F.3d at 220.[3] Here, Plaintiffs argue that in signing the APA, they did not enter into an agreement to arbitrate at all. Instead, Plaintiffs assert that the APA merely permits that a narrow band of disputes may be addressed by "expert determination" (here, by the Accounting Firm), not via arbitration, and that the remainder of any unresolvable APA-related disputes are instead to be settled in court. (D.I. 38 at 5-13) In resolving this step one question, the Court must apply "ordinary state-law principles that govern the formation of contracts" so long as such principles "govern contracts generally[.]" *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 524 (3d Cir. 2009).[4]

In arguing that the APA is not an agreement to arbitrate, Plaintiffs rely on a line of Delaware case law that is best set out in *Penton Bus. Media Holdings, LLC v. Informa PLC*, C.A.

---

[3] This step one inquiry is important, because "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (internal quotation marks and citation omitted). Therefore, a party may not be compelled under the FAA to submit to arbitration "unless there is a contractual basis for concluding that the party *agreed* to do so." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684 (2010) (emphasis in original); *cf. Kuhn Const., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396 (Del. 2010) (noting that pursuant to Delaware law, a court will "not enforce a contract that unclearly or ambiguously reflects the intention to arbitrate").

[4] The parties agree that in resolving this issue, no fact discovery is necessary; instead, the Court need only make a legal determination utilizing principles of contract construction, relying exclusively on the content found within the four corners of the APA. *See Century Indem. Co.*, 584 F.3d at 528-31.

No. 2017-0847-JTL, 2018 WL 3343495 (Del. Ch. July 9, 2018). In *Penton*, the Delaware Court of Chancery explained that Delaware law recognizes a distinction between an arbitration and an expert determination. The *Penton* Court explained that an expert determination—whether provided by an appraiser, an auditor, an accounting firm or a different type of expert—is "not an arbitration unless the parties specifically designate that expert as an arbitrator for that purpose, thereby invoking the body of law governing arbitrators." 2018 WL 3343495, at *8-10 (internal quotation marks and citation omitted). The *Penton* Court also noted that when a court makes a determination as to the type of dispute resolution mechanism agreed to by such parties, this is a question of Delaware contract law. *Id*. at *12.

In some cases (as in *Penton*) where parties contract to have an accounting firm resolve certain disputes, the answer to this "expert determination vs. arbitration" question is not that difficult, because the contract at issue explicitly states that the accountant was "acting as an accounting expert only and not as an arbitrator[.]" *Id*. at *12-16; *see also Ray Beyond Corp. v. Trimaran Fund Mgmt., L.L.C.*, C.A. No. 2018-0497-KSJM, 2019 WL 366614, at *1 (Del. Ch. Jan. 29, 2019) (concluding that a merger agreement called for an expert determination, *inter alia*, because it designated an independent accountant as an "'expert, not an arbitrator'" with regard to certain dispute resolution procedures) (citation omitted). Alternatively, sometimes parties eliminate any real doubt about this question by doing the opposite—i.e., by using contractual language stating that the disputes at issue have been submitted "for arbitration" to the accounting firm, or that the accounting firm will "arbitrate the dispute" (or by using other words to that effect). *See Agiliance, Inc. v. Resolver SOAR, LLC*, Civil Action No. 2018-0389-TMR, 2019 WL 343668, at *3-4 (Del. Ch. Jan. 25, 2019) (internal quotation marks and citations omitted).

7

Here, however, that did not happen, as the words "arbitrator" or "expert" (or variations thereof) are not used once in the 51-page APA. That said, *Penton* and other Delaware case law also provide courts with guidance as to how to resolve this question in cases like this one—i.e., cases where "it might be difficult to determine whether the parties had selected an expert determination, arbitration, or something else[.]" *Penton*, 2018 WL 3343495, at *13.

In analyzing that guidance, the Court acknowledges that a few aspects of the APA support Defendants' argument (i.e., that the Accounting Firm's role is that of an arbitrator, not an expert). For example, *Penton* explains that for years, the Committee on International Commercial Disputes of the New York City Bar Association had recommended that if parties wished to make clear that they were invoking the work of an expert (not an arbitrator), then they really should use "expert not arbitrator" language (what *Penton* refers to as a "standard phrase") in their agreements. *Id*.; *see also SGS N. Am., Inc. v. Mullholand*, 135 N.E.3d 646, 653 (Ind. Ct. App. 2019). Here, as noted above, the APA does not include that "standard" type of language. Additionally, at one point the *Penton* Court refers to contractual language stating that an accounting firm's determination is "final and binding on all parties" as "arbitration-style language[.]" *Penton*, 2018 WL 3343495, at *11 (internal quotation marks and citation omitted). And here, Section 2.3(e) does state that a dispute resolved in writing by the Accounting Firm becomes "final and binding" upon the parties. (APA at § 2.3); *see also SGS N. Am., Inc.*, 135 N.E.3d at 653 (concluding, when applying Delaware law, that the fact that an agreement permitted an auditor to not only make EBIDTA calculations, but also to make a "final and binding decision" as to an earnout dispute, suggested that the auditor had the power of an arbitrator).

8

But in the Court's view, there are many more aspects of the APA that indicate that: (1) the Accounting Firm was to make expert determinations and resolve certain narrow categories of disputes, not to serve as an arbitrator; and (2) resolving the types of disputes set out in the SAC was not within the Accounting Firm's purview. *See Penton*, 2018 WL 3343495, at *14 (noting that, in resolving this question, the "scope of the provision and the procedure that the parties agree to follow" is key). Among those are the following:

- Section 2.6(c) states that an Earn Out Statement sets forth "Buyer's *computation of Buyer EBITDA* for such Earn Out Period and the Earn Out Consideration, if any, due for such Earn Out Period." (APA at § 2.6(c) (emphasis added)) This makes it sound as if the Earn Out Statement is essentially the product of mathematical calculations, which are in turn informed by an analysis of the (largely numbers-based) inputs to "Buyer EBITDA" (e.g., net income, depreciation expense, interest expense). (*Id*. at Index of Defined Terms at 45) That type of mathematical/computational work, informed by reliance on traditional accounting principles, seems a far cry from the type of analysis that would likely be required to get to the bottom of Plaintiffs' allegations. Resolving Plaintiffs' allegations would require a fairly wide-ranging review of electronic and paper documents and witness testimony, with the goal of determining whether Defendants engaged in a lengthy scheme to circumvent the payment of Earn Out Consideration by, *inter alia*, diverting revenue to other RelaDyne subsidiaries and third parties. And since the Accounting Firm could only resolve disputes in a notice of disagreement that relates to an "Earn Out Statement[,]" (*id.* at § 2.6(d); *see also id.* at § 2.3(e)), this all suggests that the Accounting Firm was not expected to play this type of wide-ranging role. Instead, it suggests that the Accounting Firm's role was "limited to deciding a specific factual dispute concerning a matter within the special expertise of the decision maker." *Penton*, 2018 WL 3343495, at *15 (citation omitted).

- The APA states that the Accounting Firm was expected to render a decision on the matters submitted to it "within 30 days." (APA at § 2.3(e)) It seems hard to believe that a fact finder would have been able to complete the type of broad-based investigation described above in 30 days (or anywhere

9

close to that). *See Ray Beyond*, 2019 WL 366614, at *8 ("The parties' inclusion of a tight 20-day deadline [for resolution of disputes by the accountant] reinforces the conclusion that the parties did not intend to vest the [accountant] with authority over wide-ranging matters."); *see also Chicago Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 931 (Del. Ch. 2017); (D.I. 38 at 10 (Plaintiffs noting that "[w]ithout significant discovery and essentially judicial procedures, no accounting firm would be able to decide the issues disputed in this case")).

- Aside from resolving disputes over the accuracy of the Earn Out Statement, the APA only gives the Accounting Firm the ability to resolve one other type of dispute: a dispute over the accuracy of a "Statement" setting forth the "Working Capital" as of the close of business on the closing date. (APA at § 2.3(c)-(d)) And there, it is undisputed that the Accounting Firm's role is an extremely limited one: it can only resolve a disagreement based on the argument that the Statement: (1) was not prepared in accordance with generally accepted accounting principles or (2) contained "mathematical errors." (*Id.* at § 2.3(d); *see also* D.I. 38 at 7) It seems unlikely that in this regard, the Accounting Firm's discretion was significantly cabined, but that (as Defendants suggest), when it came to Earn Out Statement disputes, the APA provided for a far broader role (i.e., investigations into whether a party circumvented the payment of Earn Out Consideration in the matter set out in the SAC).[5] *See Ray Beyond*, 2019 WL 366614, at *8 (finding that where the parties invoked the work of an accountant in three other instances in a merger agreement, and there, the accountant's role was limited to "requir[ing] financial conclusions within [the] accountant's field of expertise[,]" that

---

[5] That said, the Court is not certain that Plaintiffs are correct that the scope of the Accounting Firm's ability to review disagreements regarding an Earn Out Statement is *exactly the same as* that of its ability to review disagreements over the amount of Working Capital. (D.I. 38 at 7) Section 2.3(d)'s definition of what can be included in a Notice of Disagreement relating to a Working Capital dispute contains a term ("Statement") that can only relate to a dispute over Working Capital. (APA at § 2.3(d)) And so it may be that this section is only describing the scope of review of a dispute over Working Capital, and thus that the Accounting Firm's ability to review disputes in a Notice of Disagreement regarding an Earn Out Statement is slightly different in scope. Nevertheless, the Court's point here is that if the scope of a Working Capital review is very narrow, it makes more sense to think that the scope of the other type of review left to the Accounting Firm in the APA (i.e., review of an Earn Out Statement dispute) is also going to be fairly narrow too, instead of being very broad.

10

- suggested that the accountant's role in the fourth, disputed area was similarly limited).

- So far as the Court can tell, the APA does not include reference to procedural rules that the Accounting Firm must utilize, nor otherwise provide the Accounting Firm with authority to conduct proceedings "analogous to the powers of a judge in a judicial proceeding." *Penton*, 2018 WL 3343495, at *15 (citation omitted); *see also Ray Beyond*, 2019 WL 366614, at *7 (noting that the fact that a merger agreement did not include procedural rules affording each party the opportunity to present its case, which are "typically" included in arbitration agreements, suggested that the agreement was simply allowing for an expert determination).

- The APA clearly contemplates that many disputes about its contents can proceed to litigation (at times, after mediation is attempted). (APA at § 11.17)

For all of these reasons, the Court concludes that the APA is not an agreement to arbitrate, pursuant to Delaware law. Therefore, it recommends that Defendants' request to stay the case in favor of arbitration be denied.

### B. Other Arguments for Dismissal

In addition to arguing that the case should be stayed in favor of arbitration, Defendants make a few other arguments for dismissal of the three Counts in the SAC, all of which the Court finds wanting.

As to Count I's breach of contract claim against IAS, brought pursuant to Delaware law, Defendants argue that Count I does not set out a plausible claim regarding either of the two types of alleged breaches of the APA: a violation of Section 2.6(g) and a violation of Section 2.6(f). (D.I. 36 at 15-16, 18-20; *see also* D.I. 34 at ¶¶ 46-52) Yet for the following reasons, there is enough in the SAC to render plausible allegations as to both types of breach:

- As to the alleged breach of Section 2.6(g), Defendants suggest that the SAC's allegations simply describe IAS conducting its business

11

in a "commercially reasonable manner" or set out "disagree[ments] with how [IAS exercised] its commercially reasonable judgment[,]" (D.I. 36 at 16)—and do *not* describe IAS as engaging in bad faith conduct designed to circumvent payment of Earn Out Consideration (as is prohibited by Section 2.6(g)). But the SAC's allegations, read in the light most favorable to Plaintiffs, include assertions that IAS made knowingly false representations to Plaintiffs in order to get Plaintiffs to sign the APA (e.g., representations that post-closing, IAS' business revenues would be robust, because all of RelaDyne's and RelaDyne's subsidiaries' cleaning and flushing services businesses would be performed through IAS or TFC, when IAS intended no such thing) or knowingly omitted key information in order to lure Plaintiffs into signing the APA (e.g., that Defendants did not tell Plaintiffs about a non-compete provision that TFC had with a third-party company that would restrict the amount of revenue that IAS could bring in, post-closing). (D.I. 34 at ¶¶ 19-21, 29) These are plausible allegations of bad faith conduct that, if true, might violate Section 2.6(g).[6]

- With regard to the alleged breach of Section 2.6(f), which requires that Plaintiffs receive certain Earn Out Consideration upon "Buyer's sale or disposition of substantially all of the Acquired Assets[,]" (APA at § 2.6(f)), Plaintiffs' claim is that IAS *did* dispose of substantially all of the "Acquired Assets"—not because it sold its business to a third party, but because it allowed much of IAS' expected future revenues to be diverted to subsidiaries or third parties, as set out in the SAC, (D.I. 34 at ¶ 50). The Court agrees with Defendants that this argument for breach seems "creative" and a bit of "a stretch[,]" (D.I. 36 at 19-20), as the Court guesses that Section 2.6(f) was mainly (or exclusively) expected to apply to sale-of-the-business-type scenarios, (*id.*). But Defendants make only brief argument about this basis for dismissal. And Plaintiffs point out that the APA defines "Acquired Assets" to include "the Company Assets and the Personal Goodwill"—and argue that much of the "Goodwill" in IAS was tied up in its customer account relationships, which IAS purportedly frittered away by diverting them to other RelaDyne subsidiaries or third parties. (D.I. 38 at 14-15; APA at Index of Defined Terms at 45)

---

[6] Defendants' argument that these alleged false promises or omissions cannot be actionable because the APA includes an "Entire Agreement" provision, (APA at § 11.12), misses the point. (D.I. 36 at 19) Here, Plaintiffs are alleging that IAS engaged in conduct that violates the promises and representations it made in Section 2.6(g); Section 2.6(g) *is a part* of the "Entire Agreement," and a violation of *its terms* can be actionable in a claim for breach of contract.

> Under these circumstances, the Court cannot say that the APA unambiguously precludes reliance on Plaintiffs' argument for breach of contract. *See RBAHTDSR, LLC v. Project 64 LLC*, Civil Action No. 19-1280-RGA, 2020 WL 1083781, at *4 (D. Del. Mar. 6, 2020) (citing *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)).

Next, Defendants challenge Plaintiffs' claim in Count II, which charges RelaDyne with tortious interference with contractual relations (the "tortious interference" claim) under Delaware law. Delaware law recognizes the significant economic interest a parent corporation has in its subsidiary. Thus, in order to sufficiently plead that a parent has tortuously interfered with a contract signed by its subsidiary, the plaintiff must plausibly allege facts suggesting that the interference was motivated by some malicious or other bad faith purpose—i.e., that the corporate parent defendant "'was not pursuing in good faith the legitimate profit seeking activities of [its] affiliated enterprise []' *that was a party to the contract*." *Bhole, Inc. v. Shore Inv., Inc.*, 67 A.3d 444, 453 (Del. 2013) (citation omitted) (emphasis added); *see also Shearin v. E.F. Hutton Grp., Inc.*, 652 A.2d 578, 591 (Del Ch. 1994).[7] That is what Plaintiffs have alleged here—that RelaDyne acted to divert business away from the bottom line of its subsidiary IAS and instead to

---

[7] Defendants' primary argument for dismissal of Count II is premised on a misstatement of this standard. Defendants repeatedly assert that Plaintiffs must show that RelaDyne's actions were antithetical to its pursuit of the common economic interests of "*the enterprise as a whole*[.]" (D.I. 36 at 18 (emphasis added); D.I. 40 at 9 (emphasis added)) Defendants then go on to suggest that RelaDyne's conduct could not amount to a claim of tortious interference, as even if it caused income to be taken away from IAS in a way that "negatively affected IAS[,]" that is not problematic, because the income redounded to the benefit of other RelaDyne subsidiaries and thus to the "enterprise as a whole." (D.I. 40 at 9) But this is not the relevant standard; the question here is whether RelaDyne's alleged acts were antithetical to the profit-seeking activities *of IAS*. And per the SAC, they were.

To the extent that Defendants also argue that the allegations in Count II are implausible because they cannot amount to bad faith acts taken by RelaDyne in order to circumvent payment of the Earn Out Consideration, (D.I. 36 at 17), for the same reasons as set out in the discussion of Count I, the Court rejects that argument too.

other RelaDyne subsidiaries or to third parties, all in order to circumvent payment of Earn Out Consideration under the APA. (D.I. 34 at ¶¶ 19-35, 53-56) So the Court does not see why Plaintiffs' allegations in Count II are implausible on this basis. *See PPL Corp. v. Riverstone Holdings LLC*, C.A. No. 2018-0868-JRS, 2019 WL 5423306, at *13 (Del. Ch. Oct. 23, 2019); *see also Global Recycling Solutions., LLC v. Greenstar N.J., LLC*, C.A. No. 09-976-LPS, 2011 WL 4501165, at *10 (D. Del. Sept. 28, 2011).

Last up is Count III, which seeks a declaratory judgment confirming that: (1) Plaintiffs' claims in this suit are outside the scope of Section 2.3 of the APA and are not subject to Section 2.3's dispute resolution procedures and (2) if IAS breached the APA, Plaintiffs are excused from further performance under the Contract. (D.I. 34 at ¶¶ 57-63) Defendants' sole argument is that this claim should be the subject of arbitration. (D.I. 36 at 15) For the reasons set out in Section II.A., the Court disagrees.

## III. CONCLUSION

For the reasons set out above, the Court recommends that Defendants' Motion be DENIED.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated: March 25, 2020

*Christopher J. Burke*
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE